FILED IN:

July 22, 2021

UNITED STATES DISTRICT COURT;
DISTRICT OF SOUTH CAROLINA,
ANDERSON LOCATION

5

ROBERT C. DALTON, an individual,

10        Plaintiff,                          |
                                              |     Case #: 8:21-cv-00986-JD-JDA
V.                                            |
                                              |
15  JAMES P. CLEMENTS, an individual          |
    TANJU KARANFIL, an individual,            |
    CLEMSON UNIVERSITY, a South Carolina Corp,|
    SOUTH CAROLINA DEPT. OF AGRICULTURE,      |     CIVIL COMPLAINT
    a South Carolina Corporation,             |
    THE STATE OF SOUTH CAROLINA and ET AL.    |
20                                            |
        Defendants                            |
                                              |

*RECEIVED USDC CLERK, GREENVILLE, SC — 2021 JUL 22 PM 4:03*

25  **AMENDED 2ND AMENDEDED COMPLAINT FILED AS PER COURT ORDER:
    PLAINTIFF  SEEKING 1) DAMAGES FROM CIVIL RIGHT VIOLATIONS
    REGARDING DISCRIMININATION ON THE BASIS OF DISABLTY [TRAUMATIC
    BRAIN INJURY] UNDER TITLES I AND IIT OF THE AMERICANS WITH
    DISABILITY ACT, AS AMENDED, AND UNDER SECTION 504 OF THE
    REHABILITATION ACT OF 1973, AS AMENDED, AS WELL AS DUE PROCESS,
30  EQUAL OPPORTUNIT,Y AND EQUAL PROTECTION UNDER THE LAW IN THE
    14TH AMENDMENT OF THE UNITED STATES CONSTITUTION BY DEFENDANTS
    JAMES P. CLEMENTS, TANJU KARANFIL, CLEMSON UNIVERSITY, THE STATE
    OF SOUTH CAROLINA, AND THE SOUTH CAROLINA DEPARTMENT OF
    AGRICULTURE AND 2) INJUCTION RELIEF TO PREVENT ANY FURTHER ACTS
35  OF CIVIL RIGHT VIOLATIONS REGARDING DISCRIMINATION ON THE BASIS
    OF THE DISABILTY [TRAUMATIC BRAIN INJURY] BY THE STATE OF SOUTH
    CAROLINA, THE SOUTH CAROLINA DEPARTMENT OF AGRICULTURE AND
    CLEMSON UNIVERSITY, JAMES P. CLEMENTS, AND TANJU KARANFIL UNDER
    TITLES I AND II OFTHE AMERICANS WITH DISABILITY ACT, AS AMENDED,
40  AND SECTION 504 OF THE REHABILITATION ACT OF 1973, AS AMENDED, AS
    WELL AS DUE PROCESS, EQUAL OPPORTUNITY, AND EQUAL PROTECTION
    UNDER THE LAW UNDER THE 14TH AMENDMENT OF THE UNITED STATES
    CONSTITUTION.**

45

50                                    **1.0 BACKGROUND**

1.1 History of this Civil Acton

1. This civil complaint was initially filed under a *writ of pauper* in the US Federal Court; District of New Jersey; Camden location, case # 3:19-CV-17645-MAS-TJB by the pro se, disable Plaintiff  The disabled plaintiff is afflicted with a moderate to severe traumatic brain

55    injury (TBI) and disabilities.  This civil action was transferred to US District Court; District of New Jersey, Trenton location.

2. The Plaintiff filed an amended complaint and writ of pauper prior to Defendants' attorneys filed a Motion to Dismiss for the original complaint.  Subsequently, the Honorable Judge Michael Shipp placed an administrative hold on the civil matter to review this civil

60    complaint's merit as required by Federal law.  The Court found that this civil complaint had merit, and then an Order to Proceed was granted by the Court.

3. The Defendants' attorney refiled their Motion to Dismiss with minor changes for the amended Complaint.  The TBI-disabled Plaintiff, *pro se*, filed an Object to the Motion to Dismiss.  After review, the Court dismissed the case without prejudice, ordering that a second

65    amended complaint be filed in the appropriate Federal District Court by April 2, 2021. Otherwise, the case is dismissed with prejudice. (See Court Order in Appendix ALPHA).

4. The Plaintiff is not sure how-to mark-up this 2nd amended filing.  So, the Plaintiff used a doubled underline for all new text to differential between a single underline for  new texted in the 1st amended complaint, amendments to the original complaint.  Likewise,  the Plaintiff used

70    a double strike-through to delete text of the 1st amended complaint so as to differentiate between

the text deleted with a single strike-through in the 1st amended complaint for amendments in the original complaint.

1.2 Communication by the Pro Se, TBI-disabled Plaintiff

5. The TBI-disabled Plaintiff asked the current Court to recognize the aspect of the Plaintiff's traumatic brain injury (TBI), especially the Plaintiff's the written and spoken way of communication. The TBI-disabled Plaintiff has medical documentation of his method of written and spoken communication having circumstantial, tangential, and verbose communication in his communication deficiencies related to the Plaintiff's moderate to severe TBI.

6. During this time and currently, the TBI-Disabled Plaintiff has been and continues to be treated for rehabilitation of his multiple disabilities. Furthermore, several ongoing new life-changing events continue to exacerbate the TBI-disabled Plaintiff's decline in executive functions.

7. The Plaintiff humbly requests that the Court strongly consider these and other disabilities of the Plaintiff when deciding upon matters in this civil action. The TBI-disabled Plaintiff hopes and prays that the Court realizes that the TBI-disabled plaintiff is doing the best that Plaintiff can under the Plaintiff's current abilities when the Plaintiff expresses his thoughts in writing and thinking in this civil complaint.

8. The TBI-disabled plaintiff used proceeds from his most recent federal stimulus check to file this second amended complaint in leu of *a writ of pauper*.

1.3 Basis of Financial Damages Were Independently Verified by the CU DEFENDANTS

9. Furthermore, the TBI-disabled Plaintiff has found new publicly available evidence provided by THE DEFENDANTS that has an extremely high degree of agreement with the basis of Plaintiff's financial damages sought by the Plaintiff from the Defendants.

95

1.4 Glossary of Terms

10. Appendix BETA uses a Glossary of Terms that are used in this civil complaint by the
100   TBI-disabled Plaintiff to reduce, as best as the Plaintiff is able, circumstantial, tangential, and
verbose written communication.

11. For several months and especially these past several weeks the TBI-disabled Plaintiff
is and has been experiencing cognitive overload and cognitive exhaustion make writing this 2nd
Amended complaint extremely difficult with his deficient and exacerbated decline in executive
105   functions.

12. The TBI-disabled Plaintiff is not sure how to write this complaint based upon the
Court Order. How does an individual write a seconded amended complaint with a traumatic
brain injury while under much duress outside of writing this complaint as the Plaintiff's
executive function decline due to cognitive overload and cognitive exhaust for weeks due to
110   many life changing events including the loss of two loved ones.

13. The TBI-disabled Plaintiff has considered constructing and writing a two-part
complaint. In Part, a version of the 2nd amended complaint would be without deleting strikeouts
and underlining of text of amendments from previous complaints. The TBI-disabled Plaintiff
believe that a complaint without would two parts would otherwise be too confusing to read for an
115   person without a TBI, nevertheless a person with a TBI. In a two-part complaint, Part B would
contains the new filing of a 2nd amended complaint with direct deleting strikeouts and underling
of text amendments of the previous complaint in a format as described and used in this current
filing. The Plaintiff believes that Part B would contains the total information that compares

version with amendments; But with full respect for the Courts with regards to the TBI-disabled

120 Plaintiff's executive function deficiencies, the determination of how to best construct the format

of this Court Orders 2nd Amended Complaint is even more confusing for the Plaintiff than most

of the Court's Opinion regarding the reason for dismissal .

Moreover, the TBI-disabled Plaintiff is experience double-vision, blurred vision and

massive painful, frontal lobe headaches, known as "staticky headaches" that are affecting the

125 TBI-disabled Plaintiff's cognitive abilities.  These disabilities and deficiencies are part of the

Plaintiff's moderate to severe traumatic brain injury with two subsequent concussive events.


**Filed by:**    Robert Carl Dalton, Plaintiff
130              24 Maryland Rd
                 Little Egg Harbor Twp., NJ 08087
                 Phone: 609-879-1797
                 E-mail: rca.dalton@gmail.com


14. Note 2: Robert Carl Dalton is disabled for at moderate to severe traumatic brain

135 injury (TBI) by the State of New Jersey.  Robert C. Dalton is Managing Partner of ESTEC

Technology Works, LLC, and Robert Carl Dalton currently owns 100% of the Stock of ESTEC

Technology Works, LLC.  Robert Carl Dalton is the sole representative, sole member and only

representative ESTEC Technology Works, LLC.

15. Under the Federal Law, the Americans with Disabilities Act (ADA), Robert Carl

140 Dalton requests "reasonable accommodations" under the Americans with Disabilities Act.  The

requested "reasonable accommodations" include more time to file, to act and to response to

Court practices.  Typically, Robert Carl Dalton needs twice the allotted time or more to file , to

act, and to respond.  Furthermore, Robert Carl Dalton communicates with circumstantial and

tangential means in his writing and speaking which can also be accompanied with non-

145  threatening emotional dysregulation, dyslexia, ADD, and dysgraphia. Often, Robert Carl Dalton

can experience cognitive overload which can have negative effects on his executive functions

and cause extreme fatigue, mentally and physically. Moreover, Robert Carl Dalton has a severe

photophobia which is wavelength specific (color of light). Also, Robert C. Dalton will need an

effective communication standard for his disability (deficiencies due to a moderate to severe

150  traumatic brain injury) to be used during all interactions and proceeds with the Federal District

Court.

     16. Furthermore, Robert Carl Dalton has had two subsequent concussive events since

being disabled for a TBI; These two concussive events occurred in December 2017 and March

2019. Robert Carl Dalton is currently being treated for injuries sustained in these events and for

155  original TBI injuries exacerbated by these events. Therefore, SC Code Section 15-3-40, 15-3-50,

and 15-3-60 may apply to Robert C. Dalton.

## 2.0 PARTIES INVOLVED

1. James P. Clements; individual defendant
160  President
Clemson University
201 Sikes Hall
Clemson, SC 29634
Phone: 864-656-3311
165  [Referred to herein as Defendant 1 or Clements]

2. Tanju Karanfil;
Vice President for Research
Clemson University
170  220 Kappa Street
Clemson, SC 29634
Phone: 864-656-7701
Email: tkaranf@clemson.edu
[Referred to herein as Defendant 2 or Karanfil]
175

3. Clemson University, Corporate Defendant
C/0 James P. Clements, President

201 Sikes Hall
Clemson, SC 29634
180    Phone: 864-656-3311
[referred to herein as  Defendant 3, CU, and Clemson Univ.]

4. South Carolina Department of Agriculture
Hugh E. Weathers, Commissioner
185    1200 Senate Street, Ste 500
Columbia, SC 29201
Phone 803-734-2210
[referred to herein as Defendant 4 or SCDA]

190    5. State of South Carolina
Attorney General Alan Wilson
Rembert Dennis Building
1000 Assembly St. Rm 519
Columbia, South Carolina  29201
195    Phone: (803) 734-3970
[referred to herein as Defendant 4, State of SC, or the State]

Collectively, the defendants, Clemson University, Clements and Karanfil are referred to herein
as the " CU defendants".
200
Collectively, the defendants, CU, SCDA, Clemson, and Karanfil are referred to herein as the
"hemp program defendants".

Collectively, the defendants, the State, CU, SCDA, Karanfil, and Clements are referred to herein
205    and the "DEFENDANTS".


## 3.0 VENUE, JURISDICTION AND STATUTE OF LIMITATIONS

3.1 Venue

210    17. The Venue of US District Court; District of South Carolina, Greenville is the

appropriate venue under 28 USC §1391 because the majority of DEFENDANTS reside in this

District and the causes of action arise from this District.


215

3.2 Jurisdiction

18. The jurisdiction is correct under 28 USC §1331 and 28 USC §1332. The issues arise from federal questions involving the Americans with Disabilities Act, as amended, the Rehabilitation Act of 1973, as amended, the 5th Amendment, and the 14th Amendment. The
220    amount in controversy exceeds $75,000.

3.3 Statute of Limitations

19.    In the Federal Court System, the Statute of Limitations for Civil Rights violations are dependent upon the statute of limitations of the judicating Federal Court's Federal District.
225    In this civil matter, the Statute of Limitation for Civil Rights would be the Statue of Limitation under South Carolina Law in the Federal District of South Carolina.

20.    The Statue of Limitations of this civil matter in the District of South Carolina remains tolling because the Plaintiff has two or more disabilities still being treated due to injuries sustained in accident in 2012 and, then exacerbated greatly from subsequent auto accidents in
230    2017 and 2019. Furthermore, these more than two disabilities with have existed since the Plaintiff's 2012 auto accident and have not been treated properly, if not at all, by September of 2017 when the Plaintiff's rights to take civil action began to accrue. Furthermore, on December 24, 2017, the Plaintiff was in an auto accident that exacerbated more than two disabilities that the Plaintiff had in existence. Furthermore, the Plaintiff was in another subsequent auto accident in
235    March of 2019 that worsen more than two of his disabilities. Such exemptions of Statute of Limitations can be found in Title 15 Civil Remedies and Procedures, South Carolina Code of Laws, CHAPTER 3 Limitation of Civil Action, Article 1 General Provisions.

21.    SECTION 15-3-40, SECTION 15-3-50, and SECTION 15-3-60 of Title 15 Civil Remedies and Procedures, South Carolina Code of Laws, CHAPTER 3 Limitations of Civil

240   Action, Article 1 General Provisions are penitent statues for this civil action. Moreover, the

      extension limit for the disability exception of 5-years to statute of limitations based upon the

      South Carolina code would end in September of 2022.

## 4.0 MATTERS OF LAW

245        22. The matters of laws in this civil action concern the TBI-disabled Plaintiff civil right

      regarding accessibility issues for disabled individuals suffering from a traumatic brain injury

      (TBI),  effective communication for the disabled Plaintiff who is afflicted with  a moderate to

      severe TBI, and discrimination against the Plaintiff where the discrimination was based upon his

      disability, a traumatic brain injury, in State programs, activities, and services receiving federal

250   financial assistance.  Furthermore,  Matters of Law include equal opportunity, due process

      (substantive and procedural), and equal protection under the law under the 14th amendment of the

      United States Constitution, and due process (substantive and procedural) under the 5th

      amendment.  Pertinent laws regarding this civil action for civil rights violations pertain to, but

      not limited to:

255             1) Title I of the ADA and pertinent regulations;

                2)  Title II of the ADA and pertinent regulations;

                3)  Section 504 of the Rehab73 in relationship to employment, state services, and

                state programs receiving federal assistance, and pertinent regulations by

                the USDA and USDEd pursuant to Section 504;

260             4) Due process, equal protection, and equal opportunity under the 14th

                Amendment of the U.S. Constitution;

                5) Due process under the 5th Amendment of the U.S. Constitution;

                6) Deprivation of Civil Rights 18 USC §1983; and

7) Conspiracy to Deprive Civil Rights 18 USC §1985.

265

16. Furthermore, the civil rights violations happened in relation to laws and regulations

stemming from federal and state hemp laws: The 2014 Farm Bill §7606 of Pub. L. 113-79 and

7 U.S.C. §5940-Legitimacy of Industrial Hemp Research and 2017 South Carolina Industrial

Hemp Cultivation Law, SC Code Title 46, Chapter 55.

270        17. Such 504 Regulations for the USDA are found in 7 C.F.R. 15b entitle

Nondiscrimination on the Basis of Handicap in Programs or Activities Receiving Federal

Assistance.

18. Title II of the Americans with Disabilities Act is regulated under 28 CFR §35.130 -

General Prohibitions against Discrimination on the basis of handicap.

275        19. Title 1 of the Americans with Disabilities Act against discrimination on the basis of

handicap;

20. Effective Communication regulations for section 504 are regulated under 28 C.F.R.

§35.160-164. Likewise, Effective Communication under Title I and Title II of the Americans

with Disabilities Act is regulated under 28 C.F.R. §35.160-164.

280        21. Executive Order 12250 requires the Department of Justice to coordinate the

implementation of section 504 of the Rehabilitation Act of 1973. These regulations are found

under 28 CFR Part 41 - IMPLEMENTATION OF EXECUTIVE ORDER 12250,

NONDISCRIMINATION ON THE BASIS OF HANDICAP IN FEDERALLY ASSISTED

PROGRAM.   This complaint applied to more specific regulations, but not limited to, 28 CFR

285    §§41.51-51.58.

A4.0:  Moreover, Matters of Law

290

    _____  The following matters of law and regulations under the authority of laws pertain

to this complaint:

A4.1:  Rehabilitation Act of 1973, as amended: Section 504.

A.  (Authority: 29 U.S. Code § 794 –Nondiscrimination under Federal grants and programs)

295     a. 7 CFR Part 15b – Nondiscrimination on The Basis of Handicap in Programs Or

Activities Receiving Federal Financial Assistance; Regulations by U.S. Department of

Agriculture (Authority: 29 U.S. Code § 794):

    i. § 15b.1; Purpose

    ii. § 15b.2; Applicability

300     iii. § 15b.3(g)(2) and (4); § 15b.3(l); § 15b.3(s)(2)(1); § 15b.3(g)

    iv. § 15b.4; Discrimination Prohibited: § 15b.4(a), (b)(4)(i), (b)(4)(ii)

    b. Part 35 – Nondiscrimination on the Basis of Disability in State and Local Government

Services; Subpart E. Communications (Authority: 29 U.S. Code § 794 and 42 U.S.C §

12134):

305     i. 28 CFR § 35.160(a)(1); § 35.160(b)(1), § 35.160(b)(2), § 35.164

    c. 42 U.S. Code § 2000d–7.Civil rights remedies equalization; (Authority: 29 U.S. Code

§ 794):

    i. § 2000d–7(a)(1)-Abrogation of State Immunity and  § 2000d–7(a)(2) – suits in law

        and equity allowed.

310

    A4.2:   The American Disabilities Act, as amended. Authority

      B. 42 U.S. Code Chapter 126—Equal Opportunity for Individuals with Disabilities § 12101-

         12103; 42 U.S. Code Subchapter II - Public Services; 42 U.S. Code Part A—Prohibition

315         Against Discrimination and Other Generally Applicable Provisions; § 12131-12134; 42

         U.S. Code § 12132.Discrimination

  a. Regulations pertinent to the Americans with Disabilities Act, as amended; 28 CFR Part 35 -

  Nondiscrimination On The Basis Of Disability In State And Local Government Services;

  (Authority: 42 U.S. Code § 12134. Regulation);

320         i. 28 CFR § 35.130 - General prohibitions against discrimination;

              1. 28 CFR § 35.130(a), § 35.130(b)(3)(i), § 35.130(b)(3)(ii), § 35.130(b)(7)(i), §

              35.130(b)(8), and   §35.130(d)

         iv.  28 CFR § 35.160 – Effective Communication - General

              1. 28 CFR § 35.160(a)(1); § 35.160(b)(1), § 35.160(b)(2), § 35.164

325         v. 28 CFR § 35.178 - State immunity.

         vi. 28 CFR § 35.176 Alternative means of dispute resolution.

         vii. 28 CFR § 35.175 - Attorney's fees

      C. 42 U.S.C § 1983 Civil Action for Deprivation of Rights

      D. 42 U.S.C § 1985 Conspiracy to Interfere with Civil Rights

330    E. 42 U.S.C. §1986 – Action for neglect to prevent

      F. 29 C.F.R. Part 1630 – Regulations to Implement the Equal Employment Provisions of the

         Americans with Disabilities Act.

      G. Titles I and II of the Americans with Disabilities Act, as amended.

      H. §7607 of the 2014 Farm Bill; 7 U.S. Code § 5940.Legitimacy of industrial hemp research

335         (Pub. L. 113–79, title VII, § 7606).

      I. The South Carolina Law: 2017 Industrial Hemp Cultivation; Title 46, Chapter 55.

a. Section 46-55-20 (2).

340

4.1  Matters of Law Specific to the State, and secondary to the SCDA and the CU defendants

22. The State of South Carolina is named as a defendant is this civil matter because of the state entities, CU and SCDA.  The State is the authority over these entities with power of enforcement and oversight.  The TBI-disabled Plaintiff has named the State as a defendant so

345  that any injunction granted with relation to accessibility, effective communication, and the prevention of discrimination based upon disability against the Plaintiff and other individuals with a TBI would have a state-wide reach and applicability through state policy and state training regarding discrimination, accessibility, and communication that pertains to individuals with a traumatic brain injury.  Under South Carolina law, the state entity that caused the injury and

350  harm is responsible for monetary damages.

23. Traumatic brain injury laws exist on the federal and state level.  For South Carolina, such law is in 1996 Congress passed a federal law (Public Law 104-166) creating State Advisory Councils on Traumatic Brain Injuries, and ever since reauthorized funding for such activities under this law.  Still, effective communication with and accessibility for a disabled individual

355  with a TBI has not been adequately addressed, if address at all.   Basically, effective communication with an individual with a TBI is of great importance for accessibility and participation.  Whereas in 24 U.S.C. § 280b-1c(b)(2) and (b)(3)(A)(ii) the federal government continues to recognize this nationwide need and requires every State to address the needs of citizens with a traumatic brain injury to be understood by society, to have society to be

360    awareness of this invisible disability and for in society to address these disability's medical and

rehabilitation needs.

24. The Plaintiff's email with the leader of the SC Brain Injury Council provided a

statement from this SC leader that no state-wide policy on effective communication and

accessibility exists. By far, the State of South Carolina is not alone in these important civil rights

365    issues. One sought injunction by the Plaintiff would have the effect of making The State of

South Carolina the nation's leader in this matter which would be fitting to military tradition of

the Citadel, Clemson University, and other entities around the State.

25. Moreover, the DEFENDANTS, especially CU defendant could profit by charging

professionals from various areas of state and nationwide for classes with continuing education

370    including professional from HR, health, education, and other like parts of society.

26. (Note: These matters of laws are extremely difficult for the pro se TBI-disabled

Plaintiff to navigation because of the convoluted structure and relationships between the ADA

and Rehab73 with the time allotted by the Court Order under the Plaintiff's current

circumstances. Furthermore, the coding of regulations and laws within the different titles is

375    rather extremely trying for the deficiencies in the Plaintiff executive functions as the TBI-

disabled plaintiff is still being treated for his deficiencies on more than one disability. Perhaps,

one day laws will be written and encoded in communication syntax and style with effective

communication for the individuals afflicted with a traumatic brain injury, not to mention the

common person's difficulties with those who do not speak the legalize of the legal profession

380    and Courts in general.)

27. Throughout the TBI-Plaintiff's life with a TBI, the Plaintiff has found several

exemplary good actors providing accessibility, communication, and non-discrimination with

respect to the TBI Disability. These good actors were found in both private and public entities

385 which include Walmart, the Kessler Institute for Rehabilitation, Municipal Court in Bloomfield,
NJ, the Department of Labor in State of Maryland, and, after some difficulty, TD Bank. The
email exchange between the TBI-disabled Plaintiff and Dr. Reinhard of CU is fine example of
good interaction that did not discriminate against the TBI-disabled Plaintiff's disabilities.

28. Also, the Plaintiff has examples of bad actors, but chosen not to reveal them due to
pending and possible legal action.

390

4.2 Discrimination on the Basis of Disability by State, SCDA, and CU Defendants: Accessibility

29. One of the main foundations of the Rehab73 and ADA is accessibility to government
services, programs, and activities.

30. The DEFENDANTS discriminated against the TBI-disable Plaintiff based upon the
395 disability of a traumatic brain injury arose from actions by the CU defendants. Accessibility
includes the ability to communicate effectively and the need for a general set of reasonable
accommodations that is know by all employees of the State at every facility. Evidently, the State
policy and employee training for the disability of a traumatic brain injury exists, if one did exist,
is extremely inadequate. Consequently, inadequate levels of understanding of the TBI disability
400 by the State and its entities is causing discriminated against the TBI-disabled Plaintiff by the
DEFENDANTS, especially the CU Defendants.

31. Throughout the State of South Carolina, State Entities have installed ramps, toilets,
special lift on buses, automatic door openers, and elevators in building and facilities for
individuals in wheelchairs. Throughout the State of South Carolina, the State has installed
405 elevator buttons having braille, and audio devices are provided by the State for individuals who
are blind. The States provides sign language, print, and text captioning for individuals who are
hard of hearing; CU even has language classes that teach signing. CU defendants have

ClemsonLife at CU and this program is designed with policies for individuals who are

intellectually disabled, especially the Down's syndrome individuals like a family member of the

410    Plaintiff.  Furthermore, Clements is keenly aware of programs and policies for the intellectually

disabled individual since Clements has a beloved daughter with an intellectual disability (**The**

**Plaintiff is extremely proud of the accomplishments of ClemsonLife by the Clemson**

**Family, the Clements family, and Coach Swinney**).

        32. Regardless of all this great accessibility by the DEFENDANTS, especially Clements

415    and CU, the qualified TBI-disabled Plaintiff was discriminated against based upon his disability

of a traumatic brain injury as well as the class of individuals who have a traumatic brain injury

are discriminated against based upon their disability by the DEFENDANTS.

        33. This discrimination of general accessibility is based upon disability are civil rights

violations of equal protection under the laws as found in the 14th Amendment, not only for the

420    Plaintiff, but for the class of individuals who have traumatic brain injuries.  The laws where there

exists equal protection for the TBI-disabled individuals are the ADA and Rehab73 as well as

regulations like 28 § 35.160(a)1 General: a public entity shall take appropriate steps to ensure

that communications with applicants, participants, members of the public, and companions with

disabilities are as effective as communications with others.

425        34. If the State would agree to develop effective policies and training for individuals with

TBI for accessibility and reasonable accommodation with adequate funding that could come

from CU or USDA, then the Plaintiff would agree to drop the State of South Carolina from this

civil action.

        35. This matter of law, accessibility, arose from the CU Defendants not responding to the

430    qualified TBI-disable Plaintiff repeated request for his preferred method of effective

communication under 28 §§ 35.160 (a)(1) , b(1) and (b)(2).   Further, the CU Defendants acted

with deliberate indifference as the CU Defendants failed to provide the Plaintiff with the required written notice as to why the CU Defendants could not accommodate the Plaintiff with his preferred method of effective communication as well as failed to take other action that would not

435  result in alterations or burdens upon the CU Defendants but nevertheless ensure that, to a maximum extent possible, the qualified TBI-disable Plaintiff was provided with the benefits and service of the Clemson University Industrial Hemp Research Program [referred to herein as the CUIHRP] and Mandatory Clemson University Industry Hemp Research Service [referred to herein as the MCUIHRS].

440

4.3 Civil Rights Violations of Due Process by the CU defendants and SCDA.

36. The CU defendants and SCDA violated the qualified TBI-disabled Plaintiff's civil rights of due process under the 5th and 14th amendments and in relationship to discrimination based upon the Plaintiff's disability regarding the Title 1 and Title 2 of the ADA and 504 of the

445  Rehab73. The CU defendants conspired to deprive the Plaintiff of his civil right under 42 USC 1985 that are attached the SC Industrial Hemp Cultivation Law (SC Title 44, Chapter 55), the pertinent Federal Law for Hemp in the 2014 Farm Bill, Title 1 of the American Disabilities Act, as amended, Title II of the Americans with Disabilities Act, as amended, and Section for 504 of the Rehabilitation Act of 1973, as amended as well as due process, equal protection, and equal

450  opportunity under the 14th amendment of the US Constitution and due process under the 5th amendment of the US Constitution.

37. The SCDA conspired with CU defendants to deprive the civil rights of the Plaintiff under 42 USC 1985 that are attached to the SC Industrial Hemp Cultivation law, the pertinent Federal Law for Hemp in the 2014 Farm Bill, Title 1 of the American Disabilities Act, as

455  amended, Title II of the Americans with Disabilities Act, as amended, and Section for 504 of the

Rehabilitation Act of 1973, as amended as well as due process, equal protection, and equal opportunity under the 14th amendment of the US Constitution and due process under the 5th amendment of the US Constitution.

38. CU, Clements, Karanfil, and SCDA violated the Plaintiff's civil rights under 42 USC 460 1983 causing a deprivation of the Plaintiff's civil rights that are attached to attached to the SC Industrial Hemp Cultivation law, the pertinent Federal Law for Hemp in the 2014 Farm Bill, Title 1 of the American Disabilities Act, as amended, Title II of the Americans with Disabilities Act, as amended, and Section for 504 of the Rehabilitation Act of 1973, as amended as well as due process, equal protection, and equal opportunity under the 14th amendment of the US 465 Constitution and due process under the 5th amendment of the US Constitution.

39. The CU defendants made violations of due process that occurred before the deadline for submission of applications for one of 20 hemp permits regarding accessibility through ineffective communication and not following a multitude of ADA laws and regulations regarding discrimination of a qualified disabled individual.  Furthermore, the CU defendants made 470 violations of due process that occurred before the deadline for submission of applications for one of 20 hemp permits regarding accessibility through ineffective communication and not following a multitude of Rehab law and regulation including section 504 and regulations by the US Department of Justice, especially, but not limited to 28 CFR §41 and Unites States Department of Agriculture, 7 CFR 15b regarding discrimination of a qualified disabled individual on the 475 basis of disability.

40. The  SCDA violated the qualified TBI-disabled Plaintiff's civil rights of due process under the 5th and 14th amendments and in relationship to discrimination based upon the Plaintiff's disability regarding the Title 1 and Title 2 of the ADA and 504 of the Rehab73.  The SCDA made violations of due process that occurred before and after the deadline for submission

480    of applications for one of 20 hemp permits regarding accessibility through ineffective

communication and not following a multitude of ADA laws and regulations regarding

discrimination of a qualified disabled individual.  Furthermore,  the SCDA made violations of

due process that occurred before the deadline for submission of applications for one of 20 hemp

permits regarding accessibility through ineffective communication and not following a multitude

485    of Rehab73 laws and regulations against discrimination based upon the Plaintiff disability

including section 504 and regulations by the US Department of Justice, especially, but not

limited to 28 CFR §§41 and Unites State Department of Agriculture 7 CFR 15b regarding

discrimination against  a qualified disabled individual.

41. The CU defendants arbitrary discriminated against the Plaintiff based upon his

490    disability when, without due process, the CU defendants took arbitrary actions that did not

follow rule of laws and regulations of the SC hemp law, ADA and Rehab, otherwise known as

criteria.  The arbitrary actions were not allowed in the 2017 SC Hemp Cultivation Law or SCDA

regulations.  This type of discrimination based upon the Plaintiff disability was criteria that did

not allow the Plaintiff to enjoy the benefits of and have proper access with reasonable

495    accommodations to  the SCIHPP.  And, thereby, the Plaintiff could not even determine or ask for

reasonable accommodations because of the CU Defendants' ineffective communication with

deliberate indifference.

42. The SCDA arbitrarily set criteria that had the effect of discriminating against the

plaintiff based upon his disability because these criteria were not properly disclosed but were

500    "in-the-dark" and were applied to the selection process after the deadline or submission of

application to grow hemp in the SCIHPP.   This in-the-dark criteria are evident by a comparison

of the application used by the Plaintiff and the response after submission of the application by

the plaintiff was review by the SCDA where the SCDA sent there result of their selection process

that the Plaintiff was included.

505

4.4 Applicability of Rehab73 and ADA to DEFENDANTS and Plaintiff

   43. The DEFENDANTS are covered entities by both the ADA and Rehab73.

   44. The TBI-disabled Plaintiff is a disabled individual with a record of two or more

impartments to mental and physical aspect of life.  These impairments affect major activity of

510 life.

   45. The TBI disabled Plaintiff is a qualified disabled individual for the application and

employment under the DEFENDANTS activities, programs, and services.

   46. Furthermore, the Plaintiff believes that Title I of the ADA, Title II of the ADA, and

section 504 of the Rehab73 are the appropriate laws and regulations that govern this civil action.

515 The Plaintiff believes and understands that the SCIHPP, MCUIRS, and CUIHPP are programs,

activities, and services with federal assisted. Furthermore, The Plaintiff believes ~~and kinda~~

~~understands~~ that the SCIHPP employs the permit holders for growing and processing industrial

hemp; this employment through the SCDA for the USDA's pilot agricultural program study, was

based upon the volition of about 130 applicants with 20 applicants chosen to receive permits to

520 grow and process industrial hemp in South Carolina under the SCDA with the aid of

participating and qualifying universities.

   47. The TBI-disabled Plaintiff is a qualified individual with disability because of SC

State laws, the acceptance and processing by SCDA of the Plaintiff's application to the SCIHPP

with payment of required fees, his background, and with the reasonable accommodation that he

525 would have requested from the CU defendants and the SCDA.

*48. State Laws* Under SC state laws anyone who is over 18 can be a farmer with any

education level. If the farmer wants to market his farming products the farmer has to follow

State regulations and licensing procedure. State tax laws apply to tax rates based upon declared

farmland revenues. The plaintiff was a qualified disabled individual because he met all the

530    requirements for the 2017 Industrial Hemp Cultivation law, under SC Title 46, Chapter 55.

49. Furthermore, the SC Constitution allows for the Plaintiff who was a SC resident

return to be a SC resident with full benefits of SC laws and regulations upon his immediate

return to being a SC resident. Furthermore, substantive, and procedural due process allowed for

the Plaintiff to be an applicant and be employed under the SC Title 46, Chapter 55, nevertheless

535    the TBI-disabled Plaintiff being able to have reasonable accommodations under the ADA and

Rehab73 to do so and have such due process.

*4.5 Acceptance/Processing of Plaintiff's Application for a permit by the SCDA's SCIHPP*

50. The TBI-disabled Plaintiff is a qualified individual with disability for the SCIHPP

540    because the SCDA confirmed that the TBI-disabled Plaintiff is qualified individual with a

disability. This is evident by the facts that the SCDA accepted the Plaintiff application

(Appendix Gamma) to the SCIHPP with payment, processed and reviewed the Plaintiff's

application, and then sent the Plaintiff notice (See Appendix DELTA) that he was not selected

for a permit as were the approximate other 109 applicants for the Plaintiff's application and

545    SCDA's letter to the Plaintiff informing the Plaintiff that Plaintiff was not selected for a permit).

Twenty applicants were selected for permits. However, the SCDA discriminated against the

qualified TBI-disabled Plaintiff by not afford or providing the Plaintiff's reasonable

accommodations to make the Plaintiff competitive as those twenty individuals who received

permits.

550    51. Furthermore, the Plaintiff's ability to asked for appropriate reasonable

accommodations to make the Plaintiff as competitive as the twenty permit holders were

hampered by the "in-the-dark" criteria that was used by the SCDA after the permits were

submitted.  The SCDA used very vague determination criteria when the SCDA publicly provide

the SCIHPP permit applications – the very vague  term "detailed" used with to describe plans

555    was criteria that effectively screened out or had similar effects on the TBI-disabled Plaintiff's

abilities to provide a detailed plan based upon his disability.

52.  There were other criteria that was used in the permit selection process that the SCDA

did not disclose.  These include, but not limited to, geographic balance across South Carolina,

Process experience and location, and ability to secure needed equipment and financing.

560    53. Additionally, the CU defendants as well as the SCDA did not allow for the qualified

TBI-disabled Plaintiff to approve upon his agriculture experience a reasonable accommodation

by building a team of very experienced individuals in agriculture.  For example, Dr. Flynn and

other wanted to participate with the Plaintiff in the Plaintiff's  application to the SCIHPP through

the CUIHRPP and MCUIHRS, but neither the CU defendants did not allow this nor did SCDA

565    step in to stop the discrimination by CU defendants who were discriminated against the TBI-

disable Plaintiff on the basis of his disability.  Currently, Dr. Flynn is the director/lead for hemp

program for the State of South Carolina, and she works at Clemson University.

54. Additionally, the qualified TBI-disable Plaintiff could have teamed up with some or

all of the remaining 109 applicants, who did not receive a permit, to improve his agriculture

570    experience after a permit was issued to the qualified TBI-disabled Plaintiff as a reasonable

accommodation.

55. Additionally, the qualified TBI-disabled Plaintiff had the ability to use farmland in Laurens County, South Carolina. Laurens County was the only county not to have a permit holder selected whereas the Upstate and other counties had permit holders.

575    56. Additionally, the qualified TBI-disabled Plaintiff did not have an accredited college/university partner because the CU defendants discriminated against the qualified TBI-disabled plaintiff based on his disability.

57. Moreover, the Plaintiff did not have the opportunity to know what reasonable accommodations that he could devise to make his application more financial attractive for the

580    ability to secure needed equipment and financing. For examples, a permit issued to the qualified TBI-disabled Plaintiff would make an investment opportunities for others into the Plaintiff's LLC to finance hemp operations. In such reasonable accommodation, the Plaintiff could have charge any one including the 109 individual applicants who did not receive permit, to participate with the Plaintiff; Thereby, more of the citizens of SC would have been able to participate in the

585    SCIHPP. Other similar financing activities could have been one or more reasonable accommodation.

58. *Plaintiff's Agriculture Experience*. The Plaintiff grandfather was a farmer, and his grandfather's father was a farmer. The Plaintiff's grandfather pass along his love of agriculture to the Plaintiff's grandmother who taught the Plaintiff how to grow vegetables and flowering

590    plants, including amending soil; This created enthusiasm for farming in the Plaintiff as the Plaintiff grow vegetables, flower, or other plants most of his entire life. The Plaintiff has experimented with soil composition for such activities on a pilot scalle..

59. Furthermore, the Plaintiff hold a B.S. and M.S. in ceramic engineering and materials science and engineering from top schools. Both these degrees focused on materials processing

595    including benefaction of sizing, selection, extraction, distillation, etc. The Plaintiff has had

graduate course in soil science from CU, and at CU in graduate school and other parts of his life the Plaintiff was exposed to $CO_2$ solvent extraction techniques.

60. Furthermore, the Plaintiff hold 10 patents in materials processing including biomaterial from farming operations. And, the qualified TBI-disabled Plaintiff has a pending patent application for processing hemp into chemicals.

61. The Plaintiff had experience in equipment and processing techniques for extraction of oil shale for the Hashemite Kingdom of Jordan and an Estonian venture. The Plaintiff had experience with several Polish companies in making organic fertilizer for dead animal and wastes streams, solvent extraction, biodiesel technology. The Plaintiff had experience extractions from cellulosic materials (woods and other plant materials) and had experience in algae technology for growing, extraction, and conversion.

62. Moreover, the Plaintiff had to limit the exposure to his business and research plans because he believed if the CU defendants were corrupt in law and regulations and the SCDA did nothing about this, then the SCDA must have corrupt practices, too. Apparently, the SCDA's in-the-dark criteria and discrimination on the basis of disability supports the qualified TBI-disabled Plaintiff's intuition regarding corruptions.

63. Moreover, the Plaintiff spoke with the SDCA and sent the SCDA a letter with his application discussing a need for reasonable accommodation regarding his disability, and the SCDA did not provide the Plaintiff with written notice as to why the Plaintiff's request for reasonable accommodations were an undue burden or alteration for the SCDA and the SCIHPP.

4.5 Employment under Title I under the ADA and 504 of Rehab73

64. The CU defendants and the SCDA discriminated against the qualified TBI-Plaintiff on the basis of this disability under 42 USC §§12112 (a) and (b) especially by 42 USC §§12112

620  (b)(2), (b)(3)(A), (b)(3)(B), (b)(5)(A), (b)(5)(B), and (b)(6). Upon asking for reasonable

accommodation the SCDA refused to provide them and failed to respond in writing as required

by law. The CU defendants utilizing standards, criteria, or methods of administration that have

the effect of discrimination on the basis of disability; This is evident by the CU defendants

refusal to use the Plaintiff's preferred method of communication and refused to allow the

625  Plaintiff to work with other researcher from the Agside and Engside of CU.

65. The above same is with CFR Title 29, subtitle B, Chapter XIV, part 1630.

66. Under 29 CFR 1630.29(m) and especially, (n)(1) and (n)(3)(ii). Moreover, the

qualified TBI-disabled Plaintiff met the written descriptions prepared before advertising for the

applicants in the permit application document and the SC law for Industrial Hemp Cultivation.

630  This is evident by the SCDA's acceptance, processing and response to the qualified TBI-disabled

Plaintiff's application for a hemp permit. No written response was given by SCDA or CU

defendants for reasonable accommodation requests by the Plaintiff.

67. Also, 28 CFR §41.32 applies the Plaintiff's discrimination claims, based upon

disability, too.

635

4.6 Causes of Action

68. Plaintiff had a record of disability, the plaintiff was a qualified individual under the

504 of the Rehab73, Title 1 of the ADA, and Title II of the ADA, discrimination based upon

disability by covered entities, the plaintiff was excluded from participation in and was denied the

640  benefits of services, programs, and activities of a public entity, the plaintiff was subjected to

discrimination by the public entities, the public entities being Clemson University, the State of

South Carolina and the South Carolina Department of Agriculture, lack of due process, lack of

equal protection under the law, lack of equal opportunity under the law. Defendants were aware

of plaintiff disability, ineffective communication, lack of written responses as required under the

645    ADA and Rehab73, as amended.


## 5.0 Details of the Complaint

69. All DEFENDANTS deprived the Plaintiff of his civil right (42 U.S.C. §1983) and

650    conspired to deprive the Plaintiff of his civil right (42 U.S.C. §1985). Furthermore, All

DEFENDANTS, especially, CU defendants Clemson University et al, Clements, and Karanfil,

neglected the civil rights of the Plaintiff (42 U.S.C §1986 – Action for neglect to prevent).

70. This deprivation, conspiracy, and neglect are related, but not limited to,

discrimination against the Plaintiff on the basis of disability under 28 C.F.R. §35.160(a)1, 28

655    C.F.R. §35.160(b)(1); 28 C.F.R. §35.160(b)( 2); 28; C.F.R. §35.164 under 29 USC §794 and

under 42 USC 126 subchapters I and II; 7 C.F.R. §15.b4(a), 7 C.F.R. §15b4(b)(4)(i) , 7 C.F.R.

§15b4(b)(4)(ii); 28 C.F.R. §35.130(a); 28 C.F.R. §35.130(b)(3)(i); 28 C.F.R. §35.130(b)(3)(ii);

28 C.F.R. §35.130(b)(7)(i);  28 C.F.R. §35.130(b(8) and 29 C.F.R. Part 1630 Regulations to

implement the Equal Employment Provisions of the Americans with Disabilities Act.

660    71. Furthermore, Defendants Clemson University et al, Clements, and Karanfil have

obstructed justice and committed perjury with respect to prosecution of this civil action in the

Federal Court System.  Said Defendants did not reveal the avail of New Jersey Law under SARA

in their affidavits.  SARA was known by the Defendants. The SARA document was signed by

authorized parties from New Jersey and South Carolina.

665    Furthermore, Under the Commerce Clause of the U.S. Constitution the Plaintiff had the civil

right to participate in the South Carolina Industrial Hemp Pilot Program.

72. In 2017, in the respective courses of action in an attempt to be awarded a permit to

670    grow hemp under the 2014 hemp law of South Carolina, separately, Robert Dalton as an

individual and as being the legal representative of ESTEC Technology, LLC , a South Carolina

Limited Liability Corporation, jointly presented an application for a permit to grow hemp in the

State of South Carolina to the South Carolina Industrial Hemp Pilot Program.  This application

was incomplete because of illegal, willful, malicious, knowledgeable actions which were taken

675    with intent by the DEFENDANTS causing harm and injury to Robert C. Dalton as an individual

and the same to his property, ESTEC Technology Works, LLC (ETW). ETW is and has been, at

all times, 100% owned by Robert C. Dalton, and Robert C. Dalton is and has been the Managing

Partner of this private, closely-held business entity.

73. The DEFENDANTS illegal actions are directly related to the 2017 South Carolina

680    code Title 46, Chapter 55 "Industrial Hemp Cultivation".  More specifically these actions are

related to Section 46-55-20 entitled, "Industrial Hemp Program; research, permit; regulations".

Even more specifically, these actions relate to part (2) of Section 46-55-20 as described

hereinafter.

74. DEFENDANTS also showed no deference to their mandate under Section 59-119-

685    160 (4)(a) when taking their illegal activities which violated the laws of South Carolina (SC)

regarding the SC Industrial Hemp Pilot Program.


75. As required by SC Title 46, Chapter 55, the permit application has to be submitted by

an individual, and this individual had to be a resident of South Carolina.  Consequently, Robert

690    C. Dalton submitted an application to grow hemp, manufacture hemp products, market hemp

products, buy and sell hemp products in South Carolina with the South Carolina Department of

Agriculture (SCDA) under the SC Industrial Hemp Pilot Program. Robert C. Dalton attested his

signature to his hemp permit application as an individual and as managing partner of ESTEC Technology Works, LLC.

695        76. Furthermore, the SCDA's hemp permit application and SC Code required that the applicant to participate in research with a qualified SC institute of higher education in conjunction with the SCDA; A participating institute of higher education was required to work with the applicant, manufacturer and buyer of hemp; the CU defendants -were a participating institute of higher education. The Plaintiff was an applicant, his property was the manufacturer

700     and marketer that would buy and sell hemp.

        77. The applicant, Robert C. Dalton, individual and managing partner for ESTEC Technology Works, attempted to participate in research with the CU defendants, but the CU defendants, without any explanation, refused to work with Robert C. Dalton and ESTEC Technology works whom were the applicant, manufacturer, and buyer for their application for a

705     vertically integrated operation.

        78. This vertically integrated operation would have predominantly grown, manufactured, marketed, purchased and sold the highest value hemp products, CBD products (CBD is a term used to commonly refer to one or more cannabinoids; CBD Product is a product that usually refers to a mixture of one or more cannabinoids with terpenes).

710        79. While the Plaintiff was not a resident of South Carolina at the time in 2017, the Plaintiff had several options to exercise so the application for a SCDA permit to grow hemp in South Carolina was filed by SC resident or with a SC resident.

        80. One option was, at any time before filing the application to grow hemp, the Plaintiff could have changed his residency to South Carolina, then submit the application. This was not a

715     valid option because the DEFENDANTS refused to work with the Plaintiff as required by SC law; the Defendant's actions created a situation where the Plaintiff did not have the required

participating institute of higher education involved in the hemp permit application as required by the SCDA. Thus, the DEFENDANTS willfully, knowingly, maliciously with intent chose to harm and injure the Plaintiff and his property so the Plaintiff did not have the opportunity to

720 participate in government services as other applicants were afforded by the DEFENDANTS (The CU defendants are employees of the State and a State institution of higher learning).

81. Another option was to the Plaintiff. In this option, the Plaintiff could have submitted the application signed as Robert C. Dalton, self (or applicant) and managing partner of ETW. The Plaintiff took this action which also has an accompanying notice expressing to the

725 SCDA that the Robert C. Dalton and ETW believed that the requirement of having to be "an individual who was a South Carolina resident" violated the civil rights of Robert C. Dalton and ETW under the U.S. Constitution's due process, equal protection under the law and the commerce clause as well as the commerce clause of the U.S. Constitution. ~~like~~ Like, the first option above, the option was not a viable option because the DEFENDANTS would not work

730 Robert C. Dalton and/or ESTEC Technology Works, LLC as required by SC Code 46-55-20

82. There were still more options for the Plaintiff regarding the SC residency requirement for the applicant to the SC Industrial Hemp Pilot Program by SC Code. Another option would have been to have the applicant be a resident of SC who is under contract with ETW or an employee of ETW. This option would fulfill the residency requirement of the hemp application,

735 but the actions by the DEFENDANTS would have still prevented the application from being complete due to not have a participating institute of higher education.

83. Another option would be to have DEFENDANTS provide us with a South Carolina resident who would be an applicant who would be under contract, employed or compensated by ETW; this option still would have the Plaintiff to be injured and harmed by the DEFENDANTS

740 actions which are willful, malicious, knowing and with intent. This last option was brought to the

attention of the DEFENDANTS, but the DEFENDANTS declined to respond to the Plaintiff's email regarding this residency matter.

84. Furthermore, the Plaintiff's civil rights under the Title I and Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 regarding the
745   required effective communication policy (also, referred to herein as "effective communication" Effective Communication and Effective Communication policy or standards means a written and reviewed policy that would include training of South Carolinian Employees and have written policies as to what effective communication may be required for individuals with a traumatic brain injury) have been violated by the DEFENDANTS.  The DEFENDANTS are part of the
750   State of South Carolina.  The Plaintiff was harmed and injured by lack of proper effective communication by the DEFENDANTS' willful, malicious, knowledgeable actions with intent; these actions were likely due to a lack of an effective communication policy by the DEFENDANTS.  The Plaintiff believes the DEFENDANTS do not have an Effective Communication Policy for disabled individuals with the Plaintiff's deficiencies from his
755   disability. Discovery will determine if the DEFENDANTS had an effective communication policy in 2017 for the Plaintiff's disability.  This lack of an effective communication policy prevents the TBI-disable Plaintiff and the class of individuals with this disability from have accessibility and participation in state programs, activities, and service.

85. The Plaintiff was known to most of the CU defendants.  Most CU defendants were
760   aware of the Plaintiff, the Plaintiff's property (ETW) and the Plaintiff's property doing business as Planet Energy [EXHIBIT 1].  The DEFENDANTS were given pertinent information by the Plaintiff on November 9, 2016.  Furthermore, the Plaintiff's concept of the Appalachian Energy Project was known the CU defendants  [see Exhibit 2 for the most recent information].  The DEFENDANTS knew about the Plaintiff's and ETW's "Call for Letters of Intent for the SC

765     Industrial Hemp Pilot Program Research" [see EXHIBIT 3 with memo to Defendant

Karanfil].  The DEFENDANTS were aware of Plaintiff's and ETW's desired research with

DEFENDANTS' PSA division [EXHIBIT 4], and other research of the Plaintiff's and one of

several proposals, including ETW's proposed 2-acre hemp assay, with the CU defendants

engineering and science departments at the institute of higher education [see Exhibit 5].  The CU

770     defendants  were aware of all this information and knew of the SC Hemp Cultivation Law prior

to willfully, maliciously, knowingly with intent hurt and injured the Plaintiff and his property.

86. The CU defendants who are members of an institution of higher education [Clemson

University] and an institution of higher education [Clemson University] had engaged in research

775     on industrial hemp; however, while this law states that the institution **SHALL** work "to identify

solutions for applications, applicants and new market opportunities for industrial hemp growers"

and "the purchaser or manufacture will be included under the provisions of this chapter", the CU

defendants  refused to work with DALTON/ETW (a.k.a. Planet Energy) in the Clemson

University Industrial Hemp Pilot Program under the South Carolina Industrial Hemp Program in

780     conjunction with the South Carolina Department of Agriculture (SCDA).  Thus, DALTON/ETW

were prevented from free exercise and enjoyment of their civil rights granted to them under SC

Title 46; Chapter 55; Section 20; Part (2) by the CU defendants. Furthermore, "identify

solutions" or identifying solutions are found by means of a research program; research programs

are required by States which have hemp programs under Federal Law (2014 Farm Act).  The

785     SCDA hemp program required applicants for hemp permits for growing hemp to "identify

solutions" with Clemson University [a public institute of higher learning] being that Clemson

University was engaged in industrial hemp research.  DALTON/ETW were a hemp permit

applicant who were vertically integrated to grow hemp, manufacture hemp products, sell hemp

products and purchase hemp products from other growers. Such a vertical integrated operations
790 can have sales revenues in the tens of millions of dollars.

87. Moreover, the CU defendants willfully, maliciously, and intentionally denied
DALTON/ETW access to the government services of South Carolina in the SC Industrial Hemp
Program.

88. Moreover, DALTON/ETW had an agreement with Clemson University to engage in
795 agriculture economic research, and DALTON/ETW agreed to pay the asking amount for this
research by Clemson University. This agreement was made with the agricultural side of Clemson
University by the late Dr. Jeanne Briggs [Exhibit 6] for DALTON/ETW to work with Nathan
Smith for an enterprise budget/production cost assessment which was believed to be under the
Direction of Dr. Christopher Ray.

800 89. Dr. Christopher Ray was one of two people who were key decisions makers in the
Clemson Industrial Hemp Pilot Program [CU IHPP] according to Clemson's website page about
the CU IHPP at this time in 2017. Dr. Ray was listed at the decision maker for the agricultural
side of the CU IHPP, and Dr. Karanfil was listed as the decision maker for the engineering side
of the CU IHPP.

805 90. Moreover, in August 2017, DALTON/ETW initiated the "CALL FOR LETTERS OF
INTENT FOR THE SC INDUSTRIAL HEMP PILOT PROGRAM RESEARCH" to science,
medical, and engineering researchers at qualifying institutes of higher learning [EXHIBIT 3].
Over a hundred emails were sent out across South Carolina.

91. During the entire process from beginning to when the crimes were committed,
810 DALTON/ETW followed all pertinent Federal and State Laws. Moreover, DALTON/ETW had
no interest in developing intellectual property with any university.

92. Several responses from researchers at and associated with Clemson University were received by DALTON/ETW; these researchers were from the engineering and science side of Clemson University and a medical program associated with Clemson University. As already

815   noted, DALTON/ETW had reached an agreement for agricultural economic research with the agricultural side of Clemson University through Dr. Briggs who worked for Dr. Ray.

93. Moreover, initially DALTON/ETW had more two engineering researchers associated with CU who wanted to work with DALTON/ETW on their research ideas. These researchers were associated with Dr. Karanfil's section of the SCIHPP. So, on September 4, 2017,

820   DALTON/ETW contacted the the CU defendants to meet to discuss working with these two other researchers in the engineering and science section of Dr. Karanfil's oversight. Specifically, Pres. Clements, Dr. Karanfil and Clemson University were sent these first couple emails with ETW d.b.a. as Planet Energy© in September 2017 [EXHIBIT 27; E-mails dates September 5, 2017]]

825   94. On September 05, 2017, the CU defendants emailed DALTON/ETW [EXHIBIT 27; E-mails dated September 5, 2017] informing DALTON/ETW that the CU defendants would not work with DALTON/ETW in Clemson University's Industrial Hemp Pilot Program [ SCIHPP]. DALTON/ETW replied asking if DALTON/ETW was still allowed to work with the original agreement with Dr. Briggs under Dr. Ray on September 05, 20192017; later that day the the CU

830   defendants replied to DALTON/ETW stating that DALTON/ETW could not work with Dr. Briggs, Dr. Nathan Smith and Dr. Ray. The the CU defendants specifically contacted Dr. Ray to let Dr. Ray know that he could not work with DALTON/ETW [EXHIBIT 7; E-mails dated September 5, 2017]

95. DALTON/ETW emailed Dr. Karanfil asking Dr. Karanfil what the reason for not

835   working with DALTON/ETW; Dr. Karanfil did not reply.

96. Next, DALTON/ETW contacted, via phone, several members of the Board of Trustees of CU. A few members were left messages multiple times by DALTON/ETW. A couple members spoke with DALTON/ETW; these members were Mr. Swann, Mr. Wilkins and Louis P. Batson, Jr.

840      97. Mr. Swann advised DALTON/ETW to speak with Dr. Karanfil to ask him what his reason for this denial was; DALTON/ETW emailed Dr. Karanfil asking him for the reason, but there was no response from Dr. Karanfil.

98. Mr. Wilkins spoke to DALTON/ETW, and then they exchanged emails [EXHIBIT 38]; Mr. Wilkins never provided DALTON/ETW with any return information to his inquiry.

845      99. Mr. Batson told DALTON/ETW that the CU defendants would not work with DALTON/ETW because DALTON/ETW would not provide a large amount of money to Clemson University from the DALTON/ETW research plan.

100. Ms. McAbee and Mr. Smith were left multiple messages, but they did not return DALTON/ETW's calls.

850      101. Next, I contacted the head of SCDA, but he was not in. He and the person in charge of the SC Industrial Hemp Program were out of town. The gentleman at SCDA to whom DALTON/ETW spoke said that he would make an inquiry with Clemson about this situation.

102. This SCDA person at the SCDA with called Dr. Ray, and then spoke to Dr. Ray about the situation between the CU defendants AND DALTON/ETW.

855      103. Next, this person at the SCDA called DALTON/ETW to tell DALTON/ETW about what Dr. Ray told this gentleman at the SCDA about the situation between the CU defendants and DALTON/ETW. This gentleman at the SCDA told DALTON/ETW that Dr. Ray said the decision not to work with DALTON/ETW came from "higher-up". Higher-up could only mean the Provost, President Clements, an Executive Vice President and a member or members of the

860    Board of Trustees, because at this time Dr. Karanfil and Dr. Ray were Vice Presidents.  THIS

NEEDS TO BE INVESTIGATED. Furthermore, some of the "higher-ups" were emailed by

DALTON/ETW asking the "higher-ups" what is happening and why the CU defendants are not

working with DALTON/ETW

**\*\*\*\*\***

865    104. But before going on, here is some background on Planet Energy© with CU Pres.

Clements and Clemson University (See Appendix `13).

**\*\*\*\*\***

105. Now, the complaint's further discussion of the DEFENDANTS  actions against

DALTON/ETW regarding DALTON/ETW's permit application to grow, to manufacture, to sell

870    and to buy hemp under the SC Industrial Hemp Program continues.

106. EXHIBIT 7 contains a collection of emails exchanges between the CU defendants

and DALTON/ETW.  These emails in EXHIBIT 7 discuss DALTON/ETW's participation in the

SC Hemp program with the CU defendants as the research institution which is required by the

SC Law.  At the time of this exchange, DALTON/ETW already had an agreement with the

875    agricultural side of the CU IHPP.

107. The email exchange [Exhibit 7; E-mails dated September 5, 2017] provides solid

evidence that CU defendants would not work with DALTON/ETW as required by the SC

Industrial Hemp Cultivation Law.  This email exchange by CU defendants and DALTON/ETW

is solid evidence that the CU defendants committed the crimes as listed above in this complaint.

880    108. On September 04, 2017 [EXHIBIT 7],  DALTON/ETW contacted President

Clements, Dr. Karanfil and Clemson University about a meeting on September 6, 2017 to discuss

the research with the engineering and science side of the CU IHPP.  DALTON/ETW sent an

attachment with Planet Energy's proposed hemp assay which would be a small part of the other

18 hemp acres which would be used to grow the highest value hemp product, CBD's, under a

885    CU research program for an economic study by Dr. Nathan Smith which was under the oversight

of Dr. Christopher Ray on the agricultural side of CU and managed by Dr. Jeanne Briggs

[EXHIBIT 6].

109. CBD tincture products were selling for the equivalent of between $80,000 and

$139,000 per kg CBD, and DALTON/ETW intended use the enormous profits from

890    DALTON/ETW internet retail sales and wholesale of CBD products to fund the research,

development and commercialization of other energy programs at Planet Energy© and to promote

the Appalachian Energy Project© [APPENDIX A].

110. Moreover, an ADDITIONAL SEVEN (7) Clemson University RESEARCHERS at

CU reached out to DALTON/ETW to work with DALTON/ETW'S Planet Energy at a later day

895    [EXHIBIT 10], and this date was before the final deadline for submitting a permit application to

the SCDA. BUT, these seven researchers were not allowed to work with DALTON/ETW

according to CU defendants.

111. The seven researchers were very accomplished professionals . One of these seven

CU researchers was a Senior Researcher and Engineer at the United States Department of

900    Agriculture (USDA) and adjunct professor at CU. The remaining six individuals are an

entrepreneur in bioenergy and bio-coproducts, a CU professor in Biosystems Engineering, a CU

Assistant Professor in Biosystems Engineering, a CU Assistant Professor in Environmental

Systems and Engineering, a CU Coordinator of Integrated Pest Management and Sustainable

Agriculture Programs, and an Associate Professor in Biosystems Engineering [EXHIBIT 116].

905    112. In September 2017, the DALTON/ETW permit application was sent to SCDA

without the needed agreements with CU; This lack of research agreement with CU prevented

DALTON/ETW from obtaining a permit to grow hemp in South Carolina's Industrial Hemp

Program.  DALTON/ETW withheld information on the 20-acre of farmland in Laurens County

to be farm with hemp, DALTON/ETW's full confidential research plan and full confidential

910    business plan, and did not use the two available South Carolina residents who would have signed

the application; without the involvement with one to ten of the Clemson University's researchers

and without a Clemson University research agreement with the CU IHPP, DALTON/ ETW

could not submit a proper permit for DALTON/ETW's vertical operation to grow hemp, to

extract and manufacture CBD products, to market wholesale and internet retail sales of CBD,

915    and to research hemp species and products.  Therefore DALTON/ETW had no ability to receive

a permit to grow hemp by the SCDA, and the CU defendants  caused DALTON willful,

intentional, and malicious injury and harm to DALTON/ETW.   Hence, DALTON/ETW lost

their ability to establish Planet Energy in South Carolina, lost their funding source to develop the

Appalachian Energy Project, and lost substantial revenues from the sales of CBD products from

920    18 acres of hemp containing high levels (10-12%) of CBD, terpenes and other cannabinoids.

The profits to DALTON/ETW'S retail value of these CBD product sales are between $43 million

and $63 million.

113. Therefore, DALTON/ETW withheld any proprietary, confidential, and privileged

information from being disclosed in their hemp permit application to SCDA; The malicious and

925    corrupt actions by the CU defendants caused DALTON/ETW to withhold such.

114. Robert C. Dalton and ESTEC Technology Works, LLC were harmed and injured by

the actions of the CU defendants and, possibly by the Others.  The actions of the were with intent

being false with respect to the requirements of the SC Hemp Law and were malicious and

intentional actions towards Robert Carl Dalton and ESTEC Technology Works, LLC.

930    115. The wrongful, intentional, and willful actions by the CU defendants intended to

injure Robert C. Dalton and ESTEC Technology Works, LLC to cause harm to Robert Carl

Dalton and ESTEC Technology Works.  DALTON/ETW were harmed and injured by these actions

116. The willful, intentional, and wrongful conduct by the CU defendants  were motivated primarily by unreasonable financial gain because Mr. Baston, a CU Board of Trustees member, told DALTON/ETW that the CU defendants would not work with DALTON/ETW because DALTON/ETW would not and could not provide much money to Clemson University from DALTON/ETW's research plan.  The DALTON/ETW research plan provided very little monies to the CU IHPP because the Clemson University clearly stated that  "At present, there are no Clemson PSA researchers with experience in the production of hemp" and, likewise, those Clemson researchers who worked outside of the PSA in the science and engineering departments of CU did not have experience either.  It was the intent of DALTON/ESTC during the proposed first year of the working with the CU researchers that the time spent during the first year was a learning time for future work in the relationship with the CU IHPP.  There were other possible conflicts.

117. *Other Possible Conflicts:* Planet Energy of DALTON/ETW was in direct competition with CU and CU research parks for research and commercialization funding of innovations.  Many of Planet Energy's areas of research for hemp were in direct competition for energy, biofuel, and materials work that were being researched at CU research parks which include ICAR in Greenville, Clemson's Innovation Campus and Technology Park in Anderson, and the Restoration Center in Charleston, SC.  The Competition by Planet Energy also affected other Clemson Research Centers which are directly associated with energy: SCE&G Innovation Center, the Duke Energy Innovation Center and the Duke Energy's eGRID as well as many other of CU's corporate research partners in these areas. Duke Energy Innovation Center is a joint venture between Clemson University and the South Carolina Research Authority (SCRA).

Oddly, the CU defendants never mention ~~to~~ these places to DALTON/ETW or asked DALTON/ETW (Planet Energy) to participate at these CU research centers and parks. See SC State mandate of SC Code Section 59-119-160 (4)(a).

118. The CU defendants understood that their unreasonably dangerous nature of their

960    harmful conduct, together with the high likelihood that DALTON/ETW would be harmed and injured as a result from the CU defendants' conduct, and the CU defendants' actions toward DALTON/ETW were known and approved by the CU President, CU Officers, and other ~~CUs~~ persons responsible for making policy decisions on behalf of the <u>CU defendants.</u>

119. Furthermore, the CU defendants' actions could subject the CU defendants  to

965    convictions of felonies, and the CU defendants' acts and course of conduct are proximate causes of the damage, injury, harm and insult to DALTON/ETW.

120. Other related actions by the CU defendants  were insulting to DALTON/ETW. Subsequent to the 2017 permit application extended deadline by the SCDA, CU's Webpage for the CU IHPP incorporated a very large amount of DALTON/ETW's areas or proposed research

970    in DALTON/ETW's "CALL FOR LETTERS OF INTENT FOR THE SC INDUSTRIAL HEMP PILOT PROGRAM RESEARCH" solicitation.

121. Other actions by James P.  Clements were very disturbing to DALTON/ETW. DALTON/ETW disclosed to James P. Clement that DALTON was disabled for a traumatic brain injury (TBI).  Mr. Clements did not respond to Mr. Dalton's request for an explanation as to why

975    the CU defendants  would not work with DALTON/ETW.  The American with Disabilities Act (ADA) requires that public entities, such as CU, provide the Plaintiff with the Plaintiff's preferred method of effective communication or provide him written notice explaining in detail why CU could not provide the Plaintiff's request and otherwise provide an alternative that maximizes, to ~~the~~ <u>a</u> great extend, a similar method of communication.  The TBI-disabled

980    Plaintiff believes that the DEFENDANTS should have an Effective Communication Standard

for the TBI disability for accessibility and participation in government services, programs, and

activities as provide for such accessibility and participation as the DEFENDENTS have for other

Disabilities. There is a strong likelihood that the DEFENDANTS do not have a written

Effective Communication Standard for communication with someone with a moderate to severe

985    TBI; An effective communication standard for the TBI disability would include that a reasonable

answer be given to the individual who has a TBI in order to prevent anxiety, declines in

executive functions, cognition, and depression and for, like the TBI-disabled Plaintiff ,to have

accessibilty and participation in to enjoy the benefits of, participation in, and access to all

government services, programs, and activities. Moreover, Mr. Clements actions in this matter is

990    concerning because Mr. Clements has a child with an intellectual disability [EXHIBIT 12] but

Mr. Clements treats Mr. Dalton who has an intellectual disability poorly. Furthermore, the

DEFENDANTS violates Mr. Dalton's civil rights, if the DEFENDANTS do not have an

Effective Communication Standard or Policy for someone with a TBI so that this class of

disabled individuals can have accessibility and participation in government programs, activities,

995    and service. The DEFENDANTS discriminated against the Plaintiff on the basis of disability

with regard to accessibility and effective communication because the DEFENDANTS have

standards and policies for other disabilities. These standards and policies include braille,

wheelchair ramps and elevators, aids for hearing, ClemsonLife (a program for individuals who

are afflicted with Down's Syndrome and other developmental disabilities); No such standards,

1000    programs, and/or policies exists by the DEFENDANTS for the Plaintiff's disability.

122. Moreover, the DEFENDANTS actions are more concerning because the

DEFENDANTS have a nationally recognized program for assisting young adults with

intellectual disabilities to live and earn at college degree at Clemson Unversity; this program is

known as ClemsonLIFE (https://www.clemson.edu/education/research/programs/culife/). Yet,

1005    the DEFENDANTS violate the Plaintiffs civil rights under Title II of the ADA with respect to

the Plaintiff's intellectual disability and the ADA's requirement for effective communication for

a person's disability.

## DAMAGES SOUGHT

1010    123. The Plaintiff seeks damages. The Plaintiff seeks actual damages, non-economic

damages and prays for punitive damages.

124. The Plaintiff seeks actual damages of $62 million dollars. See Appendix 1 in this

document for how the actual damages were calculated.

125. The Plaintiff seeks non-economic damages of $25 million dollars for pain, suffering,

1015    inconvenience, mental anguish, loss of enjoyment of life, injury to reputation, humiliation, fear

of loss property value, fear of loss investment, fear of loss funding, and fear of loss of future

employment of services. The DEFENDANTS were negligent in their duties to the State and to

Clemson University, their employers. DALTON/ETW was injured and harmed by the willful,

intentional and malicious actions and activity of the DEFENDANTS.

1020    126. Some of these damages are non-pecuniary; Some of these damages are pecuniary.

127. The amount of damage sought for total damages is the sum of $87 million dollars

plus the Plaintiff prays for $10 Mmillion in punitive damages. The total monetary damages being

sought are $97 million.

128. The TBI-disable Plaintiff seeks injunctions against the DEFENDANTS. Such

1025    injunctions would include that the DEFENDANTS institute an accessibility policy and training

with focus on reasonable accommodations and effective communication for individuals suffering

from a traumatic brain injury. The injunction or injunction would be for State-wide application to all State entities.

1030

\*\*\*\*\*

**V. Certification and Closing Under Federal Rule of Civil Procedure 11,**

81. By signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law

1035 or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. A. For Parties Without an Attorney I agree to provide the Clerk's Office with any changes to my address where caserelated

1040 papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: July 22, 2021.

1045 Signature of Plaintiff _____

Printed Name of Plaintiff and Pro Se: Robert C. Dalton

Robert C. Dalton, Plaintiff and Pro Se
24 Maryland Rd
1050 Little Egg Harbor Township, NJ 08087
Phone: 609-879-1797
Email: rca.dalton@gmail.com